No. 22-1643

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

SOLOMON CARTER,

*Appellant,*

v.

JOHN E. WETZEL, et al.,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**OPENING BRIEF OF APPELLANT SOLOMON CARTER AND JOINT APPENDIX VOLUME I (JA 001-22)**

CRAWFORD SCHNEIDER
UNIVERSITY OF PENNSYLVANIA
LAW SCHOOL
(Admission pursuant to
L.A.R 46.3 forthcoming)

WILL W. SACHSE
CARLA G. GRAFF
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000

*Pro Bono Counsel for
Appellant Solomon Carter*

i

# TABLE OF CONTENTS

INTRODUCTION .................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

STATEMENT OF ISSUES .................................................................... 4

STATEMENT OF RELATED CASES .................................................... 5

STATEMENT OF THE CASE ............................................................... 5

   I.  FACTUAL BACKGROUND ...................................................... 5

   II. PROCEDURAL HISTORY ....................................................... 9

STANDARD OF REVIEW .................................................................. 13

SUMMARY OF ARGUMENT ............................................................ 14

ARGUMENT ..................................................................................... 16

   I.  THE DISTRICT COURT COMMITTED REVERSIBLE LEGAL
      ERROR WHEN IT MISINTERPRETED *SCOTT V. HARRIS*
      TO PERMIT THE COURT TO VIEW VIDEO EVIDENCE,
      RESOLVE DISPUTED FACTS IN FAVOR OF THE MOVING
      PARTY, AND GRANT SUMMARY JUDGMENT. ....................... 18

   II. THE DISTRICT COURT RESOLVED GENUINE DISPUTES OF M
      ATERIAL FACT ABOUT POLITO'S USE OF OC SPRAY. ....... 25

      A. There Is A Genuine Factual Dispute As To Whether
         Carter's Demeanor Suggested He Was A Threat And
         Needed To Be Subdued. ....................................................... 26

      B. There Is A Genuine Factual Dispute As To Whether
         Carter Complied With Polito's Orders. ................................. 28

      C. There Is A Genuine Factual Dispute As To Whether Polito
         Acted With Improper Motive. ............................................... 33

      D. There is a Genuine Factual Dispute As To Whether
         Carter Suffered Injuries From The Use Of OC Spray. ........ 36

CONCLUSION ................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................ 13, 14, 28

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) .............................................. 13

*Brooks v. Johnson*,
924 F.3d 104 (4th Cir. 2019) ............................................ 33

*Brooks v. Kyler*,
204 F.3d 102 (3d Cir. 2000) ................................... 33, 36, 38

*Danley v. Allen*,
540 F.3d 1298 (11th Cir. 2008) ................................... 28, 31

*Foulk v. Charrier*,
262 F.3d 687 (8th Cir. 2001) ............................................ 29

*Giles v. Kearny*,
571 F.3d 318 (3d Cir. 2009) .............................................. 26

*Hudson v. McMillian*,
503 U.S. 1 (1992) ............................................................... 17

*Iko v. Galley*,
2007 WL 9758426 (D. Md. Sept. 17, 2007) ...................... 30

*Jacobs v. Cumberland Cnty.*,
8 F.4th 187 (3d Cir. 2021) .......................................... 20, 22

*Jones v. Wetzel*,
737 F. App'x 61 (3d Cir. 2018) ........................................ 34

*McDowell v. Sheerer*,
374 F. App'x 288 (3d Cir. 2010) ...................................... 20

# TABLE OF AUTHORITIES
## (continued)

*Montiero v. City of Elizabeth,*
  436 F.3d 397 (3d Cir. 2006) ................................................ 34

*Reese v. Sparks,*
  760 F.2d 64 (3d Cir. 1985) .................................................. 24

*Reyes v. Chinnici,*
  54 F. App'x 44 (3d Cir. 2002) ............................................ 31

*Rhodes v. Chapman,*
  452 U.S. 337 (1981) ........................................................... 16

*Ricks v. Shover,*
  891 F.3d 468 (3d Cir. 2018) .............................. 17, 26, 31, 39

*Robbins v. Meecham,*
  60 F.3d 1436 (9th Cir. 1995) .............................................. 33

*Rush v. City of Philadelphia,*
  78 F.4th 610 (3d Cir. 2023) ................................... 20, 22, 23

*Scott v. Harris,*
  550 U.S. 372 (2007) .................................................. *passim*

*Smith v. Mensinger,*
  293 F.3d 641 (3d Cir. 2002) ................................. 17, 37, 38

*Treats v. Morgan,*
  308 F.3d 868 (8th Cir. 2002) ............................................. 27

*Washam v. Klopotoski,*
  403 F. App'x 636 (3d Cir. 2010) ...................................... 30

*Wilkins v. Gaddy,*
  559 U.S. 34 (2010) ............................................................. 36

## Statutes

28 U.S.C. § 1291 .................................................................... 4

28 U.S.C. § 1331 .................................................................... 4

# TABLE OF AUTHORITIES
## (continued)

28 U.S.C. § 1367 ........................................................................ 4

42 U.S.C. § 1983 .............................................................. 4, 9, 13

**Other Authorities**

Fed. R. Civ. P. 56 .................................................... 13, 18, 25

**Other Authorities**

NIH, National Library of Medicine, National Center for
    Biotechnology Information, *available at*
    https://www.ncbi.nlm.nih.gov/medgen/39319 (last visited
    Jan. 11, 2024) ...................................................................... 36

## **INTRODUCTION**

The District Court misapplied well-established principles of summary judgment when it entered judgment for Defendants, in particular, Defendant-Appellee Officer Douglas Polito ("Polito"). Adopting in full the Report and Recommendation issued by the Magistrate Judge, the Court drew all reasonable inferences *against* Carter and *in favor* of Polito and resolved genuine issues of material fact regarding Carter's Eighth Amendment excessive force claim that should have been left for a jury.

While housed at SCI-Houtzdale in 2016, Polito discharged oleoresin capsicum ("OC") spray for Carter's alleged failure to comply with handcuffing during an incident between Carter and Polito on the cell block. But security video footage of the incident reveals that this use of force was unnecessary, malicious, and sadistic under the circumstances. In fact, a reasonable juror could view the video and conclude that Carter posed no threat to Polito or the safety of others in the prison, Carter was not aggressive and did not need to be subdued, and Carter complied with Polito's orders by kneeling before him and waiting to be handcuffed or for further action to be taken. Indeed, viewing the security footage, a

reasonable juror could conclude that Polito unjustifiably escalated the incident and bypassed less forceful alternatives that were readily available to him to maintain order.  And a reasonable juror could conclude Polito acted with a malicious desire to punish Carter, since Department of Corrections ("DOC") records **expressly prohibited** the use of OC spray on Carter, due to medical conditions that put him at a heightened risk of serious bodily harm if exposed.

The District Court should have accepted these reasonable inferences in favor of Carter as the non-movant at summary judgment. Instead, the Court erred by crediting its own interpretation of the video rather than leave the finding of facts for the jury.  The Court concluded the video barred Carter's claim as a matter of law, even though the video **blatantly contradicted** Carter's account of the incident with Polito, and the Court did not have the benefit of audio to ascertain certain details related to the interaction between Polito and Carter, including Carter's compliance with any commands Polito gave.  The Court mistakenly believed the United States Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), empowered the District Court to grant summary judgment based on its own interpretation of the video.

A jury should have had the opportunity to watch this video and weigh it along with the remaining record evidence, including statements by other officers reflecting Carter's demeanor and compliance, the grievance against Carter for noncompliance that was fully dismissed, and a subsequent internal investigation that found Polito submitted untrue reports (and that, thereafter, Polito was demoted). When properly viewed in the light most favorable to Carter, this record reveals genuine disputes of material fact as to Carter's demeanor and compliance on one hand, and Polito's orders and motive on the other. Carter should have had an opportunity to present this evidence to a jury.

What's more, the District Court overlooked Carter's strenuous objections to the Report and Recommendation and supporting evidence—namely, his declarations that established, for the record, that the video was altered to favor Polito. The video as it currently stands does not support Polito's claims or the Court's opinion. But if allowed to proceed to trial, Carter would also present testimony that supports his recollection of the events: he fully complied with Polito's orders by kneeling on both knees in front of Polito with his hands behind his back. He also would present evidence and argument to question the

authenticity of the video and establish his claim that it was altered. The Court, however, deprived Carter of his opportunity to do so.

The District Court fundamentally invaded the province of the jury, drew factual inferences, made credibility determinations, and resolved material facts. The Court therefore committed reversible legal error that warrants remand for a full trial on the merits of Carter's Eighth Amendment claims.

## JURISDICTIONAL STATEMENT

Carter appeals the U.S. District Court for the Western District of Pennsylvania's March 16, 2022 Order of final judgment in favor of Polito. JA 012-20. The District Court had subject-matter jurisdiction over Carter's 42 U.S.C. § 1983 and state-law claims pursuant to 28 U.S.C. §§ 1331 and 1367. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the District Court erred when it granted summary judgment for Polito based on the Court's assessment of a video of the incident—which led the Court to believe it could dismiss the case pursuant to the narrow rule in *Scott v. Harris*, 550 U.S. 372 (2007)—

when a reasonable juror could find that the security video footage of the incident is consistent with Carter's version of the events.

2.     Whether the District Court erred when it granted summary judgement for Polito when there were genuine issues of material fact concerning if Polito's use of OC spray was necessary or proportionate given Carter's calm demeanor and compliance, and if Polito's use of OC spray was malicious and sadistic for the purpose of punishing Carter and/or inflicting pain.

## STATEMENT OF RELATED CASES

Carter is unaware of any currently pending cases or proceedings related to this appeal.

## STATEMENT OF THE CASE

### I.     FACTUAL BACKGROUND

On November 17, 2016, Carter was housed on Block D at SCI-Houtzdale.  JA 012, 105.  While then-Sergeant Polito was conducting rounds on Block D, he stopped in front of Carter's cell and stared through the window for approximately two minutes.  JA 105, 117.  Polito did not stop at any other inmate's cell in this manner.  JA 105.

Carter, unnerved by Polito's behavior during rounds, later approached Polito in the common area of the cell block (also known as

"block out").  JA 117.[1]  Carter asked if there were something wrong with

his cell that caught Polito's attention.  JA 117.  Polito told him nothing

was wrong and to return to block out.  JA 105.  Carter decided that he

wanted to document this incident as an example of Polito's pattern of

harassment.  JA 117.

As depicted in the security video footage of the incident,[2] Carter

approached Officer Stivison, the on-duty desk officer, and asked for a

grievance form.  JA 105-06.  As Stivison searched for the form, Polito,

with his legs crossed, leaned against the officer's station desk beside

Stivison.  Polito asked Carter why he would need a grievance form.  JA

117.  Carter explained he wanted to document Polito's harassment.  JA

106.  Polito responded with an ultimatum, "you're not getting a grievance,

but you can go back to your cell."  JA 106.  Carter then requested to speak

to a lieutenant and/or shift commander, who he referred to as a "white

shirt."  JA 106.  That request was ignored.

---

[1] A security video of the incident was part of the record below as Exhibit
A to the Appendix to Polito's motion for summary judgment.  The video
is available in the record at JA 102.

[2] Descriptions of the events, if not otherwise supported with an appendix
citation, narrate the events depicted in the video at JA 102.

Instead, Polito removed his handcuffs, and demanded that Carter "cuff-up." JA 195, 204.[3] Polito radioed for additional control officers, alerting them he was dealing with a non-compliant inmate. JA 104. In response to Polito's order, Carter knelt on the ground, where he remained for the duration of his interaction with Polito. Carter signaled his compliance by stating that because he was kneeling, he could not be sprayed. JA 97, 106. Polito walked behind Carter with his handcuffs in his hands, but surprisingly—as Carter remained on the ground, not moving—Polito never attempted to handcuff Carter. Instead, Polito replaced his handcuffs, walked around to Carter's right side, and unholstered his OC spray. Simultaneously, the requested control officers begin to arrive on the scene. Two of these control officers, Archer and Rooney, heard Carter say, "I'm not being a threat, please don't spray me." JA 266-67. Still, Carter remained kneeling and made no movements towards Polito, any other officer, or inmate.

---

[3] The specific directions (or lack thereof) from Polito to Carter are subject to a variety of different accounts throughout the record. *Compare* JA 106 (Carter's account: "Polito ordered [Carter] to kneel down then lay down"), *with* JA 107 (Officer Stivison's account: Polito did not order Carter to kneel-down), *with* JA 204 (Officer Polito's account: "Inmate was given several orders to cuff-up").

At the same time as Officer Archer asked Carter to put his hands behind his back and submit to cuffing, JA 266, Polito administered a 2-4 second burst of OC spray to Carter's face, JA 120.  Carter staggered to his feet—his first attempt to move since he knelt down—but fell to the ground and was handcuffed and removed.  The control officers transported Carter to the medical facility where medical staff decontaminated his eyes and mouth.  JA 133.

For more than two years before this incident, the DOC prohibited the use of OC spray on Carter due to a combination of his "severe and uncontrolled" asthma and his use of certain classes of prescribed drugs that increased his risk for positional asphyxia.  JA 215.  An October 17, 2014, medical form (a "No Spray Order") cautions that his asthma is a medical contraindication for OC spray, and the prescribed drugs also create a condition associated with positional asphyxia, thus "preclud[ing] the use of OC."  JA 215.  As a result of this incident, Carter suffered impaired breathing, vision loss, post-traumatic stress disorder, and mental anguish leading to self-harm and three hospitalizations.  JA 37, 156.

Polito reported Carter for non-compliance in relation to the incident. Following an investigation and video disciplinary hearing, all internal disciplinary charges against Carter were dismissed without prejudice. JA 203. SCI-Houtzdale contemporaneously investigated Polito for use of excessive force when he sprayed Carter. *See* JA 103, 206. The investigation concluded that the use of force complied with policy, and Carter's initial grievance and appeals were denied. However, on appeal, the DOC's Office of Special Investigations and Intelligence found that Polito "authored a DC-121 [report] that did not accurately reflect the incident" in violation of DOC policies. JA 115. Subsequently, although allegedly having "nothing to do with [Carter's] appeal or the grievance," Sergeant Polito was demoted to Officer rank. JA 111-12. Ultimately, whether Polito's demotion was a result of his use of force against Carter is a factual question ripe for jury consideration.

## II.   PROCEDURAL HISTORY

Carter brought this lawsuit in the Western District of Pennsylvania against ten defendants, including Polito. JA 33, 49. Carter asserted claims under 42 U.S.C. § 1983 for violation of his Eighth Amendment rights and under state law for negligence, negligent infliction of

emotional distress and intentional infliction of emotional distress arising out of Polito's use of OC spray against him.  JA 40.  Polito answered the amended complaint and following discovery, moved for summary judgment.  JA 78.

Magistrate Judge Pesto recommended granting Polito's motion, JA 150, and after considering Carter's subsequently filed *nunc pro tunc* objections, Judge Pesto again recommended granting summary judgment for Polito, JA 001.  The Report and Recommendation concluded that Carter did not present any material issues of disputed fact, and as a matter of law, Polito's actions did not violate Carter's Eighth Amendment rights.  More specifically, the Report and Recommendation found that, while Carter did not repeatedly refuse Polito's orders, Carter's alleged non-compliance was sufficient to justify Polito's use of force as a means of inmate control.  JA 008-09.  Additionally, the Report and Recommendation found that although the No Spray Order prohibiting the use of OC spray was "some evidence in Carter's favor," "[a] jury could not even find deliberate indifference based on that without evidence (and there is none) that Polito subjectively believed there was a serious risk to Carter from his use of OC."  JA 008.  The Report and Recommendation

concluded, based on the "undisputed facts," "[t]here was reason for Polito to use OC, the amount of OC used on Carter was minimal, Carter was promptly seen in the medical unit where he was treated, and there is no evidence of any injury beyond transitory pain."  JA 010.  Finally, having found Polito did not act maliciously and sadistically in violation of the Eighth Amendment, the Report and Recommendation concluded that sovereign immunity barred Carter's state-law claims.  JA 010-11.

Carter filed objections to the Report and Recommendation with the District Court.  *See* JA 154, 243.  At the outset, Carter maintained in his objections that the security video of the incident, on which the Report and Recommendation relied, was improperly altered in favor of Polito.  JA 222-26, 234.  Specifically, as Carter's objections explained, he initially dropped to both knees in front of Polito, not one knee as the video depicts.  JA 223, 238.  Similarly, the video does not depict Carter attempting to shield his face with his elbow or Polito circling Carter several times before deploying the OC spray.  JA 223, 238.  In sum, Carter objected to the District Court that the video was missing events and did not accurately depict the events as they unfolded.  JA 223, 238.

11

Carter also objected to the Report and Recommendation's conclusion that he was non-compliant and suffered no injuries. JA 158-59, 238. He argued that he was compliant, but Polito used force against him in retaliation for an impending grievance—not for a justifiable penological purpose—and he suffered physical and mental injuries because of Polito's conduct. JA 159-60, 166-67. Finally, given the foregoing objections, Carter argued that sovereign immunity did not apply because Polito acted outside of the scope of his duties. JA 160-61.

Defendants responded to Carter's objections. JA 269-72. On March 12, 2022, in a nine-page order that adopted in full the Report and Recommendation, the District Court granted Polito's motion for summary judgment. JA 020. The Court concluded, primarily based on the video of the interaction, that "Plaintiff's alternative version of what transpired is utterly contradicted by the video record, and the Court must view the facts in the light depicted by the video." JA 018. Pursuant to *Scott v. Harris*, 550 U.S. 372 (2007), the Court found it could grant summary judgment because the "video fully align[ed] with the [investigative] report" from the incident and contradicted Carter's version of events. JA 018.

The District Court discussed and rejected all of Carter's additional objections.  JA 018-19.  The Court also granted a motion to dismiss the Amended Complaint as to all other defendants for failure to state a claim upon which relief can be granted.[4]  JA 012-13 n.1.  Carter appealed on April 1, 2022.  JA 021.

## STANDARD OF REVIEW

The Court reviews de novo the District Court's order granting summary judgment.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).  Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

A genuine dispute of material fact exists if the evidence is sufficient for a reasonable factfinder to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 269.  Finally, when ruling on a motion for

---

[4] The District Court dismissed other defendants as well as state law claims.  To the extent this Court reverses and allows Carter's § 1983 claims to proceed, the dismissed defendants and pendent state-law claims should proceed for the same reasons.

summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## SUMMARY OF ARGUMENT

The District Court erred when it granted Polito's motion for summary judgment. The Court resolved genuine disputes of material fact after watching a silent, ambiguous security video, rather than leave the interpretation of that video to the jury as finder of fact. By arrogating to itself the role of factfinder, the Court weighed the evidence submitted by Carter rather than taking it in a light most favorable to him and drew inferences against Carter even though he was the non-movant. The Court's ruling departed from well-established summary-judgment standards. Fundamentally, the Court denied Carter the opportunity to prove to a jury that Polito violated the Eighth Amendment when he used pepper spray: Carter complied with orders and Polito's action was contrary to a **prison order** barring use of spray against Carter for health reasons.

*First*, the District Court, both in its own opinion and the Magistrate Judge's Report and Recommendation which was adopted in full,

14

improperly determined that it alone could resolve disputed facts presented in the security video rather than leave those determinations to a jury. The Court mistakenly believed its ruling was consistent with the decision of the United States Supreme Court in *Scott v. Harris*, 550 U.S. 372 (2007), which recognized a limited circumstance when summary judgment may be appropriate based on a review of video evidence that blatantly contradicts a party's version of events. That limited circumstance does not apply in this case. The three-minute security video here supports, rather than contradicts, Carter's version of the facts. But rather than limit *Scott* to its proper scope, the Court took quintessential fact disputes away from the jury, including the circumstances surrounding the incident, Carter's compliance, and Polito's response. The Court concluded that its own interpretation of a silent, equivocal video trumped all other record evidence, including the disputed accounts of the parties, and the ***undisputed*** evidence that OC spray was contraindicated for use on Carter. This fundamental misapplication of *Scott* is reversible legal error.

*Second*, and relatedly, the District Court erred when it refused to view inferences in the light most favorable to Carter and resolved

material fact disputes related to Polito's subjective intent.  In addition to the video, evidence in the record demonstrates that Carter was not aggressive, was not a threat to Polito, and was fully compliant.  Thus, a reasonable juror could have concluded that Polito's use of OC spray on a medically contraindicated inmate was neither necessary nor proportionate to the circumstances.  And where Polito's use of OC spray was not in furtherance of a good faith effort to restore order, a reasonable juror could have concluded that he acted with an impermissible motive to punish Carter.  But the Court usurped these decisions that once again should have been left to the jury.

For these reasons, Carter respectfully requests this Court reverse the final judgment for Polito and remand this case for further proceedings and trial.

## **<u>ARGUMENT</u>**

The Eighth Amendment protects incarcerated persons like Carter from the "unnecessary and wanton infliction of pain" that is "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citations omitted).  To determine whether the use of force against an inmate violates their Eighth Amendment rights, courts use a two-part

analysis with subjective and objective components.  *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The subjective component asks whether the defendant acted with a 'sufficiently culpable state of mind,'" and the objective component asks whether the use of force was "objectively 'harmful enough,' or 'sufficiently serious' to violate the Constitution." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "[T]he pivotal inquiry" under the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (quoting *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)).

The record at summary judgment, including, most importantly, the security footage of the incident between Carter and Polito, raises genuine disputes of material fact for the jury regarding whether Polito exercised force in violation of the Eighth Amendment.  And when properly viewed in the light most favorable to Carter, these facts suggest that Polito's use of force was not a good faith effort to maintain prison security but rather, the use of OC spray on a calm, compliant, and medically contraindicated

17

inmate was intended to punish Carter.  Accordingly, summary judgment for Polito was improper.

## I. THE DISTRICT COURT COMMITTED REVERSIBLE LEGAL ERROR WHEN IT MISINTERPRETED *SCOTT V. HARRIS* TO PERMIT THE COURT TO VIEW VIDEO EVIDENCE, RESOLVE DISPUTED FACTS IN FAVOR OF THE MOVING PARTY, AND GRANT SUMMARY JUDGMENT.

Relying exclusively on the three-minute security video of the incident between Carter and Polito, a reasonable juror could conclude that Polito's use of OC spray was unnecessary to maintain order and thus violated Carter's Eighth Amendment rights.  A reasonable juror could also conclude the events that unfolded were consistent with Carter's recollection, as articulated in his Amended Complaint and objections to the Report and Recommendation.  But rather than make these reasonable inferences in favor of Carter, the District Court misapplied the summary judgment standard set forth in *Scott v. Harris*, 550 U.S. 372 (2007), finding no rational juror could "conclude that Polito acted with malice for the purpose of inflicting harm," JA 016, because "Plaintiff's version of the incident in question is belied by the video recording," JA 017.

18

The *Scott* Court crafted a specific narrow rule governing video evidence at summary judgment. The Court held, "when opposing parties tell two different stories, one of which is ***blatantly contradicted*** by the record, so that *no reasonable jury* could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. at 380 (emphasis added). The facts of *Scott* clarify the limited circumstances in which this rule applies. There, the respondent claimed there was no threat to pedestrians and motorists and that he was in control of his car during a vehicle pursuit by police. Yet the video of the chase told a very different story: the respondent fled from police at extreme speeds, swerving around a dozen cars, crossing the middle line of the road, forcing other cars into the shoulder, and running multiple red lights. *Id.* at 378-80. The *Scott* Court concluded, based on the video, that the "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380. By contrast, when the video evidence does not "blatantly contradict" the non-movant's version of events, the court

should accept this account for purposes of summary judgment. *McDowell v. Sheerer*, 374 F. App'x 288, 292 (3d Cir. 2010).[5]

Contrary to the District Court's characterization, the video here is largely ***consistent with*** Carter's version of the facts. Carter maintains that he acted peacefully, never raised his voice, did not argue with Polito or any other officer, and complied with Polito's orders by kneeling before Polito to submit to handcuffing. JA 36, 117, 158-59, 238. Even without sound, the video does not contradict Carter's account. At the outset of the video, Polito descends to the main floor where Carter calmly approaches him. The two engage in a brief and uneventful conversation before Carter walks to Stivison at the desk. Carter speaks with Stivison, who searches around the desk. Meanwhile, Polito casually leans against

---

[5] This Court has authored a number of precedential opinions applying *Scott* to summary judgment orders under the qualified immunity standard and a number of non-precedential opinions applying *Scott* to summary judgment orders for failure to state a claim. The cases that arise in the context of qualified immunity still incorporate and rely upon traditional summary judgment principles. *See, e.g.*, *Rush v. City of Philadelphia*, 78 F.4th 610, 618-19 (3d Cir. 2023); *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 193 n.8 (3d Cir. 2021). Therefore, these cases are instructive for analyzing whether the District Court viewed the facts in the light most favorable to Carter as the non-movant or whether the video reveals genuine disputes of material fact.

the desk, ankles crossed, unbothered and not acting as an officer who is facing threats or disobedience.     Carter and Polito reengage in conversation.  Carter then backs away from Polito as Polito removes his handcuffs.  Polito radios for back-up and, in response, Carter kneels in front of Polito.  Polito next moves behind Carter, with his handcuffs in his hands, but Polito puts his handcuffs back and moves to Carter's right side, all while Carter remains knelt before him.  Polito sprays Carter with OC just as back-up arrives.  At no point during this interaction does Carter gesticulate aggressively, demonstrate violent body language, or make any physical advances towards Polito.  And at no point does Polito's nonchalant posture change.  Based on the video, Polito was presented with a submissive and compliant inmate who did not pose an apparent threat, and Polito had back-up on the way.  Notwithstanding these facts, Polito still elected to escalate the situation and use OC spray.

Overlooking these consistencies with Carter's account, the District Court focused on details such as whether Carter put his hands behind his back in compliance with Polito's orders.  *See* JA 018.  But this Court's precedent has made clear that, when presented with a silent video like the security footage here, such questions are factual issues that preclude

21

application of *Scott* and should be left for a jury to resolve. In *Jacobs v. Cumberland County*, 8 F.4th 187, 196 n.8 (3d Cir. 2021), the Court confronted a similar video and concluded, "[b]ased on the silent video, the only thing [the Court] can know for sure is that [the plaintiff] and [the defendant] exchanged words." Although the defendant "had a different version of events based on the things [the plaintiff] said," "[t]he dispute over what was said is" a quintessential "genuine factual dispute." *Id.* The Court reached the same conclusion based on a video in *Rush v. City of Philadelphia*, 78 F.4th 610 (3d Cir. 2023), holding that a reasonable jury could find the plaintiff who was killed during the execution of a warrant did not act violently towards the officers. Since the video had no sound, "it is far from undisputed" that the plaintiff was aware of and ignored the officer's orders to surrender. *Id.* at 618.

The video here is no different. As described above, the video depicts a calm, submissive, and non-aggressive inmate. This does not blatantly contradict Carter's account that he complied with orders. Any further conclusions about Carter's compliance cannot be determined without sound. Indeed, without audio, it is impossible to know what Polito's orders were, whether Carter's placement of his hands violated those

orders, and in turn whether the investigative reports were "fully" corroborated. Rather, without audio, Carter's actions, kneeling in front of Polito not moving while Polito stood with his handcuffs in his hands, contradict the investigative reports. At minimum, and as described in detail below, this raises a genuine dispute of material fact that should have been left for the jury to decide. Accordingly, *Scott* is inapplicable: When Polito's recitation of facts "offers merely one of several possible 'interpretation[s]' of the events that unfolded, [the Court is] bound to choose the interpretation most favorable to [Carter]." *Rush*, 78 F.4th at 618.

Rather than acknowledge the limitations of the video evidence, the District Court latched on to the fact that "[i]t is clear from the video recording that Plaintiff did not kneel on both knees." JA 017. Whether Carter took one or two knees—as he knelt before Polito in a calm, submissive posture that posed no additional threat to Polito—does not fall within the holding in *Scott*. Just like the orders Polito gave and where Carter placed his hands, Carter's arguments about dropping to both knees leaves open evidentiary and credibility questions for the jury.

Further, for the record, Carter submits that the video footage was clearly altered before the Court viewed and based its summary judgment decision on it. Carter objected before the District Court that the video does not wholly depict the events as they occurred. *See* JA 222-26. Specifically, Carter maintains there are more than two minutes missing from the video, and if the whole video were available, it would show him kneeling on both knees before he was sprayed with OC. JA 222-26. The Court concluded that Carter offered only a "bald assertion" that the video was subject to tampering, but in Exhibit L to his objections to the Report and Recommendation, sworn to be true to Carter's knowledge and made under penalty of perjury, Carter averred that the footage was altered. JA 222-26. And such averments must be treated as affidavits sufficient to oppose summary judgment. *See Reese v. Sparks*, 760 F.2d 64, 67 & n.3 (3d Cir. 1985) (treating a complaint submitted under penalty of perjury as an affidavit at summary judgment). If the case were remanded, Carter, a self-represented litigant, would have the opportunity to ask that the record be reopened so he could demonstrate that the reports identify and video depict different times at which he was sprayed with OC spray and seek to develop expert evidence related to video

24

photoshopping. JA 224. Ultimately, a jury would then be allowed to determine the weight of this evidence and the credibility of those involved.

In sum, the District Court made a fundamental error of law when it applied *Scott* and concluded that "no rational juror could view the video and conclude that Polito acted with malice for the purpose of inflicting harm." JA 016. Instead of limiting *Scott* to its intended scope, the Court replaced its own interpretation of an ambiguous video for that of a reasonable juror. This Court should reverse and remand to correct this legal error.

## II. THE DISTRICT COURT RESOLVED GENUINE DISPUTES OF MATERIAL FACT ABOUT POLITO'S USE OF OC SPRAY.

The District Court's legal errors extend beyond its misapplication of *Scott*. Throughout its opinion, which incorporates the Report and Recommendation, the District Court improperly weighed evidence and drew factual inferences *against* Carter and *in favor of* Polito. Although there is ample evidence, in addition to the video described above, that Polito did not act in good faith when he discharged OC spray, the Court concluded Polito did not use excess force or act maliciously or sadistically. In doing so, the Court invaded the province of the jury, resolving material

disputes and credibility issues that should have been reserved for the proper factfinder.

The ultimate issue when analyzing whether force is excessive under the Eighth Amendment is one of intent: "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Ricks*, 891 F.3d at 480 (citations omitted). Courts therefore consider several factors to evaluate intent:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.

*Id.* (internal quotations omitted). "Force that exceeds that which is reasonable and necessary under the circumstances is actionable." *Giles v. Kearny*, 571 F.3d 318, 328 (3d Cir. 2009).

### A.  There Is A Genuine Factual Dispute As To Whether Carter's Demeanor Suggested He Was A Threat And Needed To Be Subdued.

"Deference is given to prison officials' adoption and execution of policies to preserve internal order, discipline and security." *Id.*  Under the relevant prison policy here, OC spray is used as "part of the force

continuum to subdue violent, aggressive inmates." JA 215. But Polito administered OC on a calm inmate who did not need to be subdued and did not pose a threat to prison security.

The video reveals a calm, unassuming interaction between Polito, Carter, and Stivison. Carter does not excessively gesticulate or exhibit any aggressive body language, and ultimately, he kneels on the ground before Polito, making no sudden or threatening movements. Polito's nonchalant body language is consistent with Carter's demeanor. And, when asked during the investigation of the incident whether Carter aggressively approached Polito, "Stivison stated that Carter seemed agitated however he would not say he approached in aggressive manner." JA 107. Officers Archer and Rooney, two of the control officers responding to the scene at the request of Polito, even heard Carter plead, "Im [sic] not a threat, [p]lease don't spray me." JA 266-67. Under similar circumstances, "correctional officers do not have a blank check to use force whenever a prisoner is being difficult." *Treats v. Morgan*, 308 F.3d 868, 872-73 (8th Cir. 2002).

Only Polito's own statements and the reports that rely on those statements suggest that Carter was aggressive. *See* JA 103, 118, 192-95,

202-04, 264. The District Court accepted Polito's narrative that Carter was "shouting demands" and "arguing," JA 015, even though the internal DOC investigation concluded that Polito's description of events in his official reports "did not accurately reflect the incident," JA 197. The Court therefore made a credibility judgment—endorsing the account of Polito over Stivison, Carter, and the video—that should have been reserved for a jury. *Anderson*, 477 U.S. at 248.

Moreover, there was no threat to general prison safety. Although, as the District Court noted, Polito was outnumbered by inmates on the block, JA 016, throughout the incident, most other inmates were seated at the tables on the block, and none engaged with Carter or Polito. In fact, once Polito escalated the situation, the inmates in the general vicinity quickly cleared away. A reasonable juror could conclude there was no threat to Polito or anyone else in the prison population.

### B. There Is A Genuine Factual Dispute As To Whether Carter Complied With Polito's Orders.

Not only was Carter calm and non-threatening, the record reveals that he was also compliant throughout the incident. Courts have recognized that OC spray may be an appropriate "means of controlling unruly inmates" who have "failed to obey a jailer's orders." *Danley v.*

*Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008), *overruled on other grounds Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). *See Foulk v. Charrier*, 262 F.3d 687, 701-02 (8th Cir. 2001) (a reasonable jury could have found for plaintiff on an Eighth Amendment claim where he testified "he was being compliant" when he was pepper sprayed).

The District Court relied on Carter's alleged noncompliance—albeit "simple and not defiant noncompliance"—to justify Polito's use of OC spray. JA 005. But the order Carter received, and in turn, whether he complied with that specific order, are disputed facts. There are five different versions of Polito's order reflected in record: (1) "place your hands behind your back to be handcuffed," JA 106, (2) "submit to handcuffing," JA 108, (3) "cuff-up," JA 106, 195, (4) "comply with handcuffing procedures," JA 106, and (5) "kneel and lay down on the ground," JA 106. Polito's own recollection of his order is not entirely clear. *Compare* JA 204 (Polito's report stating "inmate was given several orders to cuff-up"), *with* JA 264 (Polito's statement that he told Carter to place his hands behind his back).

If the order were phrased in more general terms, a reasonable juror could find that Carter's response, kneeling before Polito without moving,

was an effort to comply with that order. And if Carter attempted to comply—or at minimum did not intend to ignore Polito's orders—the use of OC spray was an unnecessary use of force. *See Iko v. Galley*, 2007 WL 9758426, at *10 (D. Md. Sept. 17, 2007) ("It is not at all clear that Shreve needed to deploy the pepper spray for nine to fourteen seconds given that Decedent was not confrontational and, in fact, attempted to comply with the officers' orders."). In fact, immediately after the incident in question, Polito filed a misconduct report against Carter alleging he was non-compliant with orders to "cuff-up," and the non-compliance charge was dismissed following a video misconduct hearing. JA 265. Nonetheless, based on its own interpretation of the video and investigative reports, the District Court resolved a key factual issue and concluded that Polito ordered Carter to "put his hands behind his back in order to be handcuffed." JA 017. *Contra Washam v. Klopotoski*, 403 F. App'x 636, 640 (3d Cir. 2010) (concluding in the face of a disputed order from a corrections officer that the contents of an order must be viewed in the light most favorable to the inmate).

Even assuming Carter were not directly obeying Polito's order when he knelt before him, because Carter remained calm and non-threatening,

Polito had options short of the use of OC spray to encourage or compel compliance. *See Ricks*, 891 F.3d at 480 (considering the "relationship between the need and the amount of force that was used" and efforts to "temper the severity of" of the force utilized). As the District Court acknowledged, Polito had an opportunity to handcuff Carter but declined to do so: "Polito starts to walk behind [Carter], apparently to cuff him. He then moves back in front of [Carter]." JA 015. Polito had his handcuffs out and presumably ready to use when he walked behind Carter, but Polito then paused, and inexplicably put the cuffs away. Polito instead *escalated* the situation and used OC spray, bypassing a less severe alternative. Polito likewise passed on the opportunity to await back-up support before spraying Carter. In fact, he sprayed Carter before the control officers that he radioed could intervene. JA 266-67. *Cf. Reyes v. Chinnici*, 54 F. App'x 44, 47 (3d Cir. 2002) (noting the Plaintiff failed to "suggest what appropriate alternative response was available to Defendant under the circumstances"); *Danley*, 540 F.3d at 1309 ("The use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell, when there were other readily available alternatives, was excessive.").

31

Without addressing any of these issues, the Report and Recommendation concluded that Polito attempted to temper the severity of the use of force because "any jury viewing the video would notice Polito spraying at Carter's eyes (probably the most painful and therefore most effective spot) and not at his nose and mouth." JA 005. Not only does this conclusion violate well-established summary judgment standards by once again drawing every inference in favor of Polito, but it is also nonsensical. A reasonable juror viewing the video simply cannot make out where on Carter's face Polito aimed. And even if it were possible to discern Polito's aim, OC spray is an aerosol with a wide range of impact that inevitably covers a wider radius than its target. And it did here, as evidenced in the video when Stivison, seated at the desk near Polito and Carter, covered his mouth to protect himself from the spray's trajectory.

The record therefore reveals disputed facts regarding whether Carter's compliance with Polito's orders warranted the use of OC spray under the circumstances. This issue should have been left for the jury to resolve.

## C.  There Is A Genuine Factual Dispute As To Whether Polito Acted With Improper Motive.

An officer violates the Eighth Amendment when he uses force "not merely in good faith to maintain or restore discipline, but rather out of malice for the very purpose of causing harm." *Brooks v. Kyler*, 204 F.3d 102, 109 (3d Cir. 2000).  "[C]orrections officers cross the line into an impermissible motive—using force maliciously and for the very purpose of causing harm—when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination." *Brooks v. Johnson*, 924 F.3d 104, 113 (4th Cir. 2019) (internal quotation marks and citations omitted).  *See also Robbins v. Meecham*, 60 F.3d 1436, 1440 (9th Cir. 1995) (holding an intent to punish can establish a cause of action under the Eighth Amendment).

There is a genuine issue of material fact as to whether Polito acted with an impermissible motive to prevent Carter from filing or to punish him for attempting to file a grievance.  The sequence of events is particularly telling.  Carter went to Stivison to get a grievance form shortly after the interaction with Polito regarding his cell.  JA 105-06.  When Polito asked Carter why he would need a grievance form, Carter told Polito he intended to report him for harassment. Polito retorted

"you're not getting a grievance" just before the interaction escalated. JA 159. Accordingly, it was for a jury to determine whether Polito was trying to dissuade or punish Carter for filing a grievance. *Montiero v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("Motive is a question of fact that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor." (citations omitted)).

The use of OC spray appears particularly punitive given Carter's documented medical conditions. Carter had two contraindications for the use of OC spray: severe and uncontrolled asthma and the acute risk of positional asphyxiation due to certain prescribed drugs. JA 215. As documented in a No Spray Order that had been on file since October 2014, "these conditions preclude the use of OC spray" on Carter. JA 215. Given this express prohibition, as well as the less severe alternatives available to him during the incident, it was excessive for Polito to resort to OC spray. *Cf. Jones v. Wetzel*, 737 F. App'x 61, 65-66 (3d Cir. 2018) (approving of the use of OC spray where it was a "last resort" and the inmate "had been medically cleared for its use and a nurse was present with the compliance team to attend to Jones's medical needs").

34

The District Court's attempt to reason around this No Spray Order defies logic.  While the Report and Recommendation concluded "[a] jury could reasonably find that Polito knew of Exhibit J," JA 005, it went on to reason "[i]t does not follow from this that Polito had any personal knowledge about any particular risk to Carter from the use of OC."  JA 006.  But the very purpose of the form is to alert corrections officers to when OC spray will cause serious and disproportionate harm and when they must avoid using it against an incarcerated person.  At minimum, Carter's introduction of this form raised a genuine dispute of material fact as to whether the use of OC spray on Carter was malicious.[6]

Once again, the jury should have had the opportunity to consider and weigh this evidence of Polito's improper motive.

---

[6] To the extent the Report and Recommendation suggested this form may not sufficiently establish Carter's contraindication because "the examiner (whose signature is illegible) did not describe any findings in support of the checked condition," this is an evidentiary issue that should be resolved at trial, not summary judgment.  JA 003.  And to the extent that Carter may have been subsequently "cleared for OC spray" in 2018 is another factual consideration the jury should have weighed at trial. JA 003.

**D.**   **There is a Genuine Factual Dispute As To Whether Carter Suffered Injuries From The Use Of OC Spray.**

The Eighth Amendment "protects against cruel and unusual force, not merely cruel and unusual *force* that results in sufficient *injury*." *Brooks*, 204 F.3d at 108 (emphasis in original).  Accordingly, the "absence of proof of minor or significant injury should not warrant dismissal," *id.*, and even where a plaintiff has "adduce[d] no objective evidence of anything but *de minimis* injuries," their claims can survive summary judgment, *id.* at 103.  *See also Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (holding in that the absence of "some arbitrary quantity of injury" does not require granting summary judgment to the defendants).

Immediately after Polito discharged OC spray, Carter was taken to the infirmary and evaluated.   JA 106.   Nurse Simington's report documented that Carter was experiencing "emotional lability."[7]  JA 132. Coupled with Carter's documented diagnoses of schizoaffective disorder, bipolar, and antisocial personality disorder, *see* JA 173-74, a reasonable

---

[7] The National Institutes of Health (NIH), defines emotional lability as "[u]nstable emotional experiences and frequent mood changes; emotions that are easily aroused, intense, and/or disproportionate to events and circumstances."  NIH, National Library of Medicine, National Center for Biotechnology                  Information,                  *available                  at* https://www.ncbi.nlm.nih.gov/medgen/39319 (last visited Jan. 11, 2024).

juror could conclude that Carter suffered emotional trauma from the incident and his underlying mental illnesses were exacerbated by Polito's use of force.

A reasonable juror could also find that the use of OC spray exacerbated Carter's severe and uncontrolled asthma, of which the prison was on notice since 2014. JA 215. The Report and Recommendation concluded that "the video contradicts Carter's claim of breathing issues and shock," JA 004, because "any jury viewing the video would notice Polito spraying at Carter's eyes . . . and not his nose and mouth, and in a short burst, not in a spray that would saturate Carter's breathing air," JA 005. As detailed above, *see supra* Section I, it is impossible to tell based on this video, filmed with a camera hung to capture the entire block area, how much spray was released and whether the OC spray was in fact targeted at his eyes or if the spray made its way mere inches down Carter's face to his nose and mouth. *Smith* is particularly instructive on this issue. This Court held, relying in part on medical records that did not describe treatment for the assault at issue and only noted chronic asthma treatment, that "the district court erred in focusing so narrowly on the absence of serious injuries in deciding if Smith could establish a

claim based upon excessive force." *Smith*, 293 F.3d at 648. Importantly, the Court emphasized that weighing the nature and extent of the injuries with each party's version of the facts "is not an issue of law a court can decide." *Id*. at 649. *Smith* demands the same result here. It is the role of the fact finder, not the court, to consider the evidence submitted, including the medical forms and nurse's report, and determine the extent of Carter's injuries.[8]

\* \* \* \*

At bottom, the District Court premised all its conclusions on inferences drawn in favor of Polito and *against Carter*. But, when properly viewed in the light most favorable to Carter, there are genuine factual disputes as to Carter's demeanor and compliance, as well as Polito's orders and motive. These factual disputes leave an open question for the jury as to whether Polito's use of OC spray was force "applied in a

---

[8] That Carter did not offer additional medical records or independent advice "to corroborate his allegations regarding his injuries" is unsurprising and irrelevant. *Brooks*, 204 F.3d at 108 n.7. When analyzing injury at summary judgment, "it is important that [courts] recognize that an inmate who is proceeding pro se, is in a decidedly difficult position from which to generate record evidence on his behalf," and "his affidavits . . . are about the best that can be expected from him." *Id.* (internal quotation marks and citations omitted).

good-faith effort to maintain or restore discipline" or was done "maliciously and sadistically to cause harm." *Ricks*, 891 F.3d at 480. Summary judgment was therefore in error, and the case should be remanded for trial.

## CONCLUSION

For the reasons stated above, Carter respectfully requests that this Court reverse the order granting summary judgment for Polito and remand the matter for trial.

Dated: January 31, 2024

Crawford Schneider
UNIVERSITY OF PENNSYLVANIA
LAW SCHOOL
(Admission pursuant to
L.A.R. 46.3 forthcoming)

Respectfully submitted,

*/s/ Carla G. Graff*
Will W. Sachse (PA 84097)
Carla G. Graff (PA 324532)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
will.sachse@dechert.com
carla.graff@dechert.com

*Pro Bono Counsel for
Appellant Solomon Carter*

## <u>CERTIFICATE OF ADMISSION TO THE BAR</u>

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I hereby certify that Will W. Sachse and Carla G. Graff are members in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: January 31, 2024          */s/ Carla G. Graff*
                                 Carla G. Graff
                                       (Pa. ID No. 324532)
                                 DECHERT LLP
                                 Cira Centre
                                 2929 Arch Street
                                 Philadelphia, PA 19104
                                 Tel: (215) 994-4000
                                 carla.graff@dechert.com

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that:

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 7,880 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(a)(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced serif typeface (Century Schoolbook) in 14-point font using Microsoft Word.

Dated: January 31, 2024

*/s/ Carla G. Graff*
Carla G. Graff
   (Pa. ID No. 324532)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104 T
el: (215) 994-4000
carla.graff@dechert.com

## CERTIFICATE OF COMPLIANCE WITH
## LOCAL RULE OF APPELLATE PROCEDURE 31.1(c)

This brief complies with the electronic filing requirements of L.A.R. 31.1(c) because:

1.     The text of the electronic brief filed with the Court is identical to the text of the paper copies of the brief to be filed with the Court and served on the parties; and

2.     The PDF file containing this brief electronically filed with the Court via the electronic filing system was scanned for viruses using Metadact and no virus was detected.

Dated: January 31, 2024                    */s/ Carla G. Graff*
                                           Carla G. Graff
                                               (Pa. ID No. 324532)
                                           DECHERT LLP
                                           Cira Centre
                                           2929 Arch Street
                                           Philadelphia, PA 19104
                                           Tel: (215) 994-4000
                                           carla.graff@dechert.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2024, I caused the foregoing Opening Brief and all volumes of the Joint Appendix to be filed via the Third Circuit CM/ECF system, which automatically served all parties entitled to service.

Dated: January 31, 2024

/s/ Carla G. Graff
Carla G. Graff
   (Pa. ID No. 324532)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
carla.graff@dechert.com

# TABLE OF CONTENTS

## VOLUME I (BOUND WITH BRIEF)

Report and Recommendation, Dkt. No. 76, Jan. 14, 2022 ..............JA 001

Memorandum and Order, Dkt. No. 79, March 17, 2022 ................JA 012

Notice of Appeal, Dkt. No. 81, Apr. 1, 2022....................................JA 021

## VOLUME II

Docket Sheet, No. 3:18-cv-00232-SLH-KAP ...................................JA 023

Complaint, Dkt. No. 1-4, Nov. 16, 2018...........................................JA 033

Memorandum Order, Dkt. No. 3, Nov. 20, 2018 .............................JA 040

Defendant's Answer to Plaintiff's Complaint,
Dkt 15, March 18, 2019......................................................................JA 044

Amended Complaint, Dkt. 21, July 15, 2019...................................JA 049

Defendant's Answer to Plaintiff's Amended Complaint
Dkt. 32, May 19, 2020 .......................................................................JA 063

Answer to Defendant's Objections to Discovery Material/Interrogatories
Dkt. 40, Aug. 20, 2020 ......................................................................JA 068

Motion for Summary Judgment, Dkt. 41, Aug. 31, 2020 ...............JA 078

Brief in Support of Defendants' Motion for Summary Judgement
Dkt. 42, Aug. 31, 2020......................................................................JA 082

Defendants' Statement of Material Facts not in Dispute,
Dkt. 43, Aug. 31, 2020 ......................................................................JA 095

Exhibit A, DIVAR Video of Incident 2016-A-933.........JA 101

Exhibit B, OSII Investigative Summary 2016-
A-933 ....................................................................................JA 103

Exhibit C,
Official Inmate Grievance #654622 – Solomon Carter . JA 109

Exhibit D, Extraordinary Occurrence Report .................JA 118

Exhibit E, Photographs of Plaintiff .............................JA 123

Exhibit F, DC-457 Medical Incident/Injury Report
    November 17, 2016 .................................................JA 128

Exhibit G, DC-121 Employee Report of Incident
    RN R. Simington. ...................................................JA 131

Defendants' Response in Opposition to Plaintiff's Motion(s) to Compel
Discovery at [ECF49/50], Dkt. 52, Nov. 6, 2020 ...........................JA 134

Order, Dkt. 55, Dec. 7, 2020.............................................JA 139

Motion to Enforce, Dkt. 60, March 4, 2021 ...................................JA 143

Exhibits A-C, Inmate's Request to Staff
    Member. ....................................................................JA 146

Order, Dkt. 62, March 19, 2021 .......................................JA 149

Report and Recommendation, Dkt. 69, Sept. 2, 2021 ..................JA 150

Objection to Summary Judgment and Recommendation,
Dkt. 71, Sept. 29, 2021 .....................................................JA 154

Exhibits A, Mental Health Diagnosis..........................JA 173

Exhibits B, School Records. ........................................JA 175

Exhibits C, Affidavit. ...................................................JA 188

Exhibits D, False Allegations Authored by
    Respondent Only......................................................JA 190

Exhibits E, Special Investigator Barnacle
    Report.......................................................................JA 196

Exhibits F, Other Report. ............................................JA 200

Exhibits G, DWOP .....................................................JA 202

Exhibits H, Intelligence Captain K. Shea
    "Investigation Predicate".........................................JA 205

Exhibits I, Legal Assistance Policy DC-ADM
    007.............................................................................JA 207

Exhibits J, No Spray Order ..........................................JA 214

Exhibits K, Requests for Access to Medical Records.....................................................................JA 216

Exhibits L, Declaration................................................JA 222

Response to Plaintiff's Objections to the Report and Recommendation at [ECF 69] Dkt. 73, Oct. 12, 2021 ..................................JA 227

Brief in Opposition, Dkt. 74, Oct. 29, 2021 ....................................JA 232

Objection to Second Summary Judgment Report, Recommendation Dkt. 77, Feb. 4, 2022 ......................................................................JA 243

Exhibits 1, Statement Continued ...............................JA 264

Exhibits 2, DWOP.......................................................JA 265

Exhibits 3, Employee Report of Incident......................JA 266

Exhibits 4, Photo.........................................................JA 268

Response to Plaintiff's Objections to the Report and Recommendation at [ECF 77], Dkt. 78, Feb. 11, 2022 ..................JA 269

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SOLOMON CARTER,                          :
           Plaintiff                   :
      v.                                 : Case No. 3:18-cv-232-SLH-KAP
SECURITY OFFICER POLITO,                 :
           Defendant                   :

Report and Recommendation

Recommendation

Plaintiff Solomon Carter, an inmate in the Pennsylvania prison system, *see* Commonwealth v. Carter, 249 A.3d 1188 (Pa.Super.2021), filed a complaint on November 20, 2018, subsequently amended on July 15, 2019, alleging federal and state law claims against employees of the Pennsylvania Department of Corrections as a result of the use of oleoresin capsicum (OC) spray against him on November 17, 2016 at S.C.I. Houtzdale by defendant corrections officer Polito. *See* ECF nos. 4, 21, respectively. Polito filed a motion for summary judgment and supporting documents on August 31, 2020. *See* ECF nos. 32, 41-44, respectively. After the grant of several extensions of time to file a response to the motion for summary judgment, I denied the last motion for extension and recommended granting Polito's motion for summary judgment. ECF no. 69. Carter then filed objections to the report and recommendation, attaching several exhibits thereto. ECF no. 71. The Court recommitted the matter to me to take into consideration Carter's objections, which can be regarded as a *nunc pro tunc* response to Polito's motion for summary judgment.

After review of the augmented record I adhere to my previous recommendation: defendant Polito's motion for summary judgment, ECF no. 41, should be granted.

Report

Carter, an inmate, alleges that on November 17, 2016, Polito, a corrections officer, "maliciously and sadistically" sprayed him with OC in conflict with a medical directive on record at the prison and thereby violated state law and the Eighth Amendment.

*Standard*

A party moving for summary judgment bears the initial burden of pointing the district court to the basis in the record for its argument that there is no genuine issue of material fact. Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does so, Fed.R.Civ.P. 56 then obliges the party opposing summary judgment to show by competent evidence that there is a genuine factual dispute, that is, that sufficient evidence

1

exists so that a reasonable jury applying the relevant law could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986). Where there is a factual dispute, all reasonable inferences must be drawn in favor of the nonmoving party, in this case the plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). This does not mean that the burden of proof shifts to Polito: Carter still has to show a genuine issue for trial, not just that it is conceivable that Polito's use of force could have violated his rights. The Supreme Court spoke to this very issue at the dawn of the modern era of summary judgment procedure, observing that evidence of collateral conspiracies was insufficient to create a genuine issue of fact about the existence of an antitrust conspiracy:

> Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: **if** petitioners had no rational [] motive to conspire, and if their **conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.** (my emphasis)

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., *supra*, 475 U.S. 574 at 596-97.

### *Facts*

First, to clear up what is and what is not at issue, based on Carter's misinterpretation of statements made by DOC employees during the internal review of this matter Carter alleged in the course of discovery and alleges in his objections that there was a videorecording made from a handheld camera on the day of the incident and that it has been concealed by the Department of Corrections; Carter also alleges in his objections, particularly in Exhibit L, that the videorecording of the unit from the fixed camera on the unit that was a key piece of evidence in my initial review was "tampered with (i.e. Photo Shopped)," and his movements, Polito's movements, the background witnesses, and the time stamp in the video have all been altered. There is no competent evidence in support of either assertion. It is black letter law that a party cannot defeat a properly supported motion for summary judgment by offering only conclusory allegations or denials. Hardwick v. Packer, 546 Fed.Appx. 73, 77 (3d Cir. 2013)(affirming summary judgment for corrections officer defendants against a claim of excessive use of force). It is apparent that Carter's recollection of events, discussed below, differs from the scene depicted by video. Differences between his recollection and the videorecord are not competent evidence that the videorecord is fraudulent.

In light of the foregoing, the record as previously presented by defendants is the record on which the motions should be decided, with two key additions: plaintiff's Exhibits J and K, ECF no. 71-10 and 11. Exhibit J is what plaintiff has referred to as the

"medical directive:" it is a DOC form that has four columns used to document an inmate's contraindications for OC exposure and use of restraints that might trigger positional asphyxia. Fourteen diseases or conditions are listed in the left column, with boxes in the next two columns to check either "normal" or "abnormal" for the inmate. The right column provides space to describe any findings in support of a check in the "abnormal" column. Underneath all this is a line stating "Any of these conditions preclude the use of OC." Carter has one check in the "abnormal" column for a condition described as a contraindication for OC, namely "Bronchitis, Asthma, or Emphysema -severe and uncontrolled." The form is dated October 2014 and the examiner (whose signature is illegible) did not describe any findings in support of the checked condition.

Exhibit K is five pages of back and forth inmate requests to staff and replies in the Fall of 2020, in which plaintiff sought to retrieve what appears to ultimately have been Exhibit J from his medical records. The document was ultimately ordered produced through a motion to compel, *see* ECF no. 55, but in the course of the exchanges someone whose name looks like "Simpson" remarked that "as of 10-23-18 you were cleared for OC spray."

Second, Carter has contended throughout that Polito was demoted as a result of his excessive use of force. *See* ECF no. 71 ¶6. The records of the DOC, discussed below, show that there was the usual internal investigation of the use of force, and reading the record closely suggests that Polito was believed by the investigative personnel to have improperly shaded his description of events to make it appear that Carter was more aggressive. The internal review did not find Polito used excessive force, nor was Polito sanctioned for excessive use of force. Where there is a disagreement between the accounts given by Carter and Polito, Rule 56 already requires me to assume a jury will accept Carter's account. Any sanction that might have been imposed on Polito is therefore not only irrelevant but superfluous.

As I wrote in my previous report, both parties provided accounts of the relevant events in their pleadings and in interviews during a formal investigation by the Pennsylvania Department of Corrections. *See* ECF no. 44-1. In addition, there is a video record of the entire confrontation, and the DOC investigation also included an interview of an eyewitness, Officer Stivison. The video record lacks sound and as I have noted where accounts of statements made are in conflict those conflicts must be resolved favorably to Carter, but the unambiguous video is conclusive evidence of what it depicts and I need not accept Carter's contrary statements about facts like the length of time Carter and Polito were together before other officers arrived, the distance at which Polito sprayed Carter, the duration of the spray, and the effect of the spray on Carter.

There is no real disagreement about the prelude to the use of OC. On November 17,

2016, Polito was making rounds when Carter approached him and questioned why Polito paused in front of his cell. Polito informed Carter that there were no issues and that Carter should return to his "block out" or he can go to his cell. At that point Carter approached the officers' station where Officer Stivison was working and requested a grievance; Carter claimed that Polito had a history of harassing him and he wanted it to stop. Officer Stivison could not find a grievance.[1] Polito again demanded that Carter go to his block or cell. Carter refused and Polito then utilized his radio to notify Control that an inmate was refusing to return to his cell. After Polito used his radio he ordered Carter to put his hands behind his back to be placed in handcuffs.

As I previously wrote, it is not in dispute that Carter heard this order and did not comply with it. This is a key point. Carter himself describes the dialogue in his Amended Complaint as Polito telling him "now you're going to have to cuff up," to which Carter replied with an exculpatory explanation, and then Polito giving him an order to "lay down on the ground, get on your knees and lay down flat." The videorecord that matches up with this exchange shows Polito notifying Control by radio and removing his OC spray from its holster. Here the accounts diverge, mostly because Carter tacitly assumes that because he was not defying all of Polito's order it cannot be said that he was defying Polito's order. But there is no dispute of fact that Carter did not comply with Polito's order to him to submit to being cuffed. In Carter's Amended Complaint and opposition to summary judgment he argues that by kneeling (the video shows Carter going to one knee, but Carter asserts in Exhibit L that he knelt down on both knees and only shifted to one knee after kneeling for about a minute) he complied with the order; he adds that if "[Polito] had actually [stepped] forward to handcuff [Carter] it is apparent [Polito] would have done so without incident." *See* ECF no. 21, ¶10 *et seq.*; ECF no. 71, ¶ 5.

Polito, for his part, stated that Carter took a knee with the comment, "Now you can't spray me." I disregard this statement to the extent that it implies active defiance or anything else about either Carter or Polito's state of mind. The video shows Carter going to one knee with his hands in front of his body as the other officers arrive on the scene. At this point Polito administers the pepper spray to Carter's eyes in what seems to me like a second-long burst (Polito himself estimated it more favorably to Carter as being a 2-4 second burst; Carter adds the unsupportable claim that despite the videorecord Polito had circled him for "2 minutes or more" looking for a clear shot at Carter's face while Carter knelt with his head down in the bend of his elbow.) The video shows that after being sprayed Carter stands up in what I have characterized as a reflexive stagger, then goes

---

[1] Carter asserts that Polito's use of OC spray was to maliciously and sadistically prevent him from filing a grievance. *See* ECF no. 71 at 6, ¶ 5. The facts do not support this: Carter was not filing out a grievance form, nor according to Stivison's uncontradicted account was a grievance form even available to Carter at the time of the incident, nor is there any evidence that Polito or anyone else subsequently attempted to prevent Carter from filing a grievance.

back down to one knee and then to a prone position. The assisting officers handcuffed Carter without further incident and took him to the infirmary for evaluation and decontamination.

The medical records in evidence, with pictures, show no injury was caused by the OC spray other than the discomfort intended by its use as shown in the videorecord. *See* ECF no. 44-1. Carter alleged in his original Complaint that "I had major breathing problems and I went into shock. The staff thought I was dead and took [me] to medical. I have suffered vision loss, PTSD, and has affected my Mental Condition [sic] to the point where I started cutting myself. These conditions still exist today." ECF no. 4, p. 5. By the Amended Complaint, ECF no. 21, this has been reduced to a claim of "bodily harm and mental anguish and the like." The video contradicts Carter's claim of breathing issues or shock as an immediate response to the OC. In his opposition to summary judgment, Carter's injuries disappear entirely: in ECF no. 71 at 13-14, Carter asserts that "he does indeed have" asthma, and that "the agitation of asthma should be held as serious injury." That Carter had asthma in 2016 is not in dispute. Nothing else has any basis in the record.

*Inferences*

Polito argues, ECF no. 42 at 6, that Carter has not made a *prima facie* case that excessive force was used after Polito gave Carter "numerous" instructions to return to his cell. Taking the facts in the light most favorable to Carter, there was no repeated refusal of orders. There was however admitted noncompliance with the order to be cuffed, with Carter kneeling down only at the point when the other corrections officer arrived. If as I must assume a jury would disregard Polito's allegation that Carter said "now you can't spray me," it was simple and not defiant noncompliance, but noncompliance nonetheless.

Second, before Exhibit J was part of the record, I noted that there was no evidence in support of Carter's claim of a medical exemption from the use of OC gas and no evidence Polito knew about any such exemption. The first point is cleared up, but there still is no direct evidence that Polito knew about the existence of Exhibit J. However, Polito does not put the matter at issue and it seems reasonable to assume that the DOC would not have such a form unless it was intended to be used for guidance by corrections officers. As Carter notes, by 2016 he had been in custody for several years, and as is apparent from Carter's account of the incident Carter and Polito were familiar with each other. A jury could reasonably find that Polito knew of Exhibit J. I note that this might help Polito as much as it helps Carter: any jury viewing the video would notice Polito spraying at Carter's eyes (probably the most painful and therefore most effective spot) and not at his nose and mouth, and in a short burst, not in a spray that would saturate Carter's breathing air. There is no evidence to support Carter's claim that the form alerted anyone to a risk of death or serious injury from any particular amount of OC. The form's

use of the word "preclude" suggests the obvious meaning of the word, that corrections officers were not to use OC on Carter. Polito could be found to have disobeyed the instruction on the form. It does not follow from this that Polito had any personal knowledge about any particular risk to Carter from the use of OC.

Third, no reasonable jury could find Carter suffered any injury beyond the immediate and temporary pain that OC is intended to cause. Carter produces nothing (and does not claim anything exists) showing any injury, including any "agitation" (*i.e.* aggravation) of his asthma. To the contrary, what little evidence is in the record suggests that by 2018, a year after the incident and a year before the complaint was filed, even the previous restriction on the use of OC gas against Carter was lifted. Carter has not provided or pointed to the existence of any evidence that he has ever sought treatment for any medical condition that could be attributable to the pepper spray used by Polito. Neither the original Complaint, filed almost two years after the incident, nor the Amended Complaint allege any such treatment.

Carter, maybe, is attempting to excuse the lack of evidence when he asserts, ECF no. 71 at 14, that he filed more than 15 requests for "the documents" and all were "circumvented." Those "documents" are not his medical record. Plaintiff's two discovery requests are of record at ECF no. 35 and ECF no. 36: they ask (*see* Request for Documents no. 10) for what ultimately has been submitted as Exhibit J, but they do not even ask for any other medical records. Plaintiff's motions to compel at ECF no. 49 and ECF no. 50 are similarly focused (and as focused were granted by me at ECF no. 55; there was a subsequent dispute over whether plaintiff had to pay for his copies, *see* ECF no. 62) on Exhibit J. In any case Carter does not now assert any injury beyond the fact that he had asthma and was sprayed. He argues, ECF no. 71 at 12-13, that "Defendants sadistic intent offers that no injury whatsoever should have taken place in the first place" and "this alone is sufficient "dispute for a tribune." I take that to mean he asserts that evidence of unnecessary use of force even without injury creates an issue to be resolved by a jury. I discuss that below.

<u>Analysis</u>

To restore or to maintain order, corrections officers are permitted to use force that would not be acceptable in other contexts. *See* <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986) (shotgun used against inmate plaintiff). An abundance of caselaw makes it clear how <u>Whitley v. Albers</u> applies to the use of OC: use of OC to bring a prisoner into compliance with an order is not a violation of Eighth Amendment rights, but use of OC as a form of corporal punishment is. <u>Whitley v. Albers</u> requires Carter to show at this stage of the proceeding that there is a genuine issue of fact about whether Polito used OC spray "maliciously and sadistically for the very purpose of causing harm." <u>Id.</u> Excessiveness is

not the test – that is applicable to pretrial detainees, *see* Kingsley v. Hendrickson, 576 U.S. 389, 402 (2015) - nor is deliberate indifference, *see* Whitley v. Albers, id.

Even in the pretrial detainee context where the only question is the objective reasonableness of the force used, a court is required to respect the fact that the objective reasonableness of the use of force is to be judged from the viewpoint of an officer on the scene and not from the viewpoint of a peaceful judge's chambers. *See* Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973). The decision about whether there is a genuine issue of fact certainly cannot be based on after the fact claims by Carter, that "if" Polito "would have actually set set forward to handcuff Plaintiff it is apparent Defendant would have done so without incident." ECF no. 71 ¶ 5. No jury can require an officer to read the mind of an inmate. *And see* Blair v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002) ("conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment").

In the past five decades no one has improved on Judge Friendly's opinion in Johnson v. Glick that the determination whether the constitutional line has been crossed should weigh factors such as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted. *See* Smith v. Mensinger, 293 F.3d 641, 648-49 (3d Cir.2002), *quoting* Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir.2000)(balancing the need for use of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the threat to staff and other inmates perceived by the corrections officers, and any efforts made to temper the severity of the force used.)

The focus is on the use of force and not injury. Using OC on an inmate locked in his cell who posed no imminent threat to staff or inmates, even if no serious injury is caused, can be found by a jury to violate the Eighth Amendment. Robinson v. Danberg, 673 Fed.Appx. 205, 212 (3d Cir. 2016). On the other hand, evidence as to the type and severity of any injury suffered is relevant because a *de minimis* injury is inconsistent with many claims that excessive force was used, much less that it was sadistically used. *See* Grayer v. Edison Twp., 198 Fed.Appx. 203, 209 (3d Cir.1998) (Fourth Amendment).

Carter argues a claim of excessive force should not be dismissed just because he had the good fortune to escape serious injury. *See* ECF no. 71 ¶ 5. This is true as a point of pleading, and it is even relevant at the summary judgment stage in cases like sexual assault where no physical injury occurs but the use of force is repugnant to the conscience. *See e.g.* Ricks v. Shover, 891 F.3d 468, 474 (3d Cir. 2018). But here, Carter began with the allegation that the use of OC was malicious and sadistic because Polito almost killed him, and at this stage several years later is reduced to arguing in essence that Exhibit J imposes strict liability on Polito. That is not correct: while Exhibit J is some evidence in Carter's

favor, it is evidence within the existing framework of the law. In light of Exhibit J, a reasonable jury could make a supportable finding that Polito's use of force disobeyed the DOC's internal guidelines for the protection of inmates like Carter. A jury could not even find deliberate indifference based on that without evidence (and there is none) that Polito subjectively believed there was a serious risk to Carter from his use of OC.

*A fortiori*, no reasonable jury following the law as given by the Supreme Court, the Third Circuit, or this district could find that Polito's use of OC spray was malicious or sadistic. *See* Passmore v. Ianello, 528 Fed.Appx. 144, 148 (3d Cir. 2013) ("[B]efore Defendant Ianello resorted to using the pepper spray, he warned Passmore, giving him one more chance to comply. In light of these undisputed facts, the use of pepper spray was reasonable in these circumstances and the District Court properly granted the Defendants' motion"); Giles v. Kearney, 516 F. Supp. 2d 362, 369 (D. Del. 2007), aff'd, 571 F.3d 318 (3d Cir. 2009) ("[T]he use of force was justified in response to Giles defiant and argumentative behavior, as well as his repeated refusals to obey orders. By spraying capstun instead of using physical handling, Blades applied proportionate force to quell Giles' behavior."); Enoch v. Perry, 2020 WL 4057643, at *7 (W.D.Pa. July 20, 2020) ("Here, although the use of pepper spray by an officer to secure compliance with an order would not seem to be objectively unreasonable, the same cannot be said for the later use of the spray, given Simmons' claim that he was unconscious. . . because the object of its usage was no longer to secure compliance but to inflict needless pain."); Brown v. Beard, 2009 WL 10701467, at *12 (W.D. Pa. Mar. 9, 2009)(Where an inmate did not sustain any significant injuries, the use of both a stun gun and OC gas is not an excessive use of force.)

Brown v. Beard presents a useful comparison. In response to an inmate destroying his cell, an extraction team gave the inmate several direct orders to submit himself to be handcuffed through the food slot. The inmate did not comply, and although it is obvious that an inmate in his cell presents no threat to anyone outside the cell, a corrections officer administered a two-second burst of OC through the food aperture in the cell door. After that the inmate submitted to being handcuffed. When the inmate was removed for decontamination and a strip search, the inmate "refused several direct orders to spread his cheeks so that the Officer could check his anal cavity." In response, another officer used another two-second burst of OC against the inmate. Then, while the inmate was being transferred from cuffs to a restraint chair, another officer used a stun gun on him when he began resisting the application of the arm restraints. He was then placed in a restraint chair for eight hours. 2009 WL 10701467, at *11.

Contrary to the way Carter frames the argument, his failure to comply with Polito's order need not have been accompanied by aggression against Polito to be a refusal justifying the use of force to restore or maintain order. Footdragging and partial

compliance to orders are often as disruptive as total refusal, particularly as here where the encounter is out in the middle of the housing unit. Polito (and Stivison and every other corrections officer who can count) had to be aware that even with other officers arriving to assist they were and always are grossly outnumbered by unrestrained inmates. (It is not clear whether Polito knew that Carter was serving life for stabbing someone to death but Polito would of course know that many inmates present and watching that day had committed violent crimes.) Whether by himself or as a spark or excuse to other inmates on the unit Carter presented an incalculably greater danger to corrections officers than the inmate in <u>Brown v. Beard</u> who, already subdued and isolated, was simply not complying with an order to display his buttocks.

Short of turning every encounter into a wrestling match the only tools corrections officers have available to them are applied psychology and the threat of minor physical discomfort, whether immediate discomfort from OC gas or deferred discomfort from placement in the RHU. Here psychology failed, and even if a jury could lay that failure at the feet of the corrections officer and not the inmate, to find Polito's use of OC malicious and sadistic because Carter might have obeyed the order to be cuffed after additional officers arrived would be to govern Polito and every other corrections officer by the whim of the inmates. As far as a use of force goes, a 2-4 second burst of spray to the eyes (not at the nose or lungs or indiscriminately into a closed area) is objectively far less use of force than the handcuffs used by the arriving corrections officers to take Carter to be decontaminated. And as for injury, it was transitory.

In all contexts a court is required to avoid second-guessing judgment calls made by correction officers who are best suited to understand the reality of prison interactions. "[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." <u>Sandin v. Conner</u>, 515 U.S. 472, 482–83 (1995) (citations omitted). *See also* <u>Bell v. Wolfish</u>, 441 U.S. 520, 547, 99 S. Ct. 1861, 1878, 60 L. Ed. 2d 447 (1979) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); <u>Florence v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 566 U.S. 318, 322–23, (2012) ("In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security."); <u>Id</u>. at 326 ("Maintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face.").

Corrections officers, like other government officials who are required to make

judgments, are shielded from liability for money damages when their conduct does not violate clearly established legal rights. *See* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). If official defendants "reasonably but mistakenly conclude[]" that their conduct conformed to the law they are entitled to immunity. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (*per curiam*). Qualified immunity therefore operates to additionally protect Polito from liability at the "sometimes hazy border between excessive and acceptable force," unless he was on notice that his conduct was unlawful. Couden v. Duffy, 446 F.3d 483, 492 (3d Cir.2006) (Fourth Amendment), *quoting* Saucier v. Katz, 533 U.S. 194, 206 (2001).  Another way of putting that is that to find Polito liable, Polito had to have "fair warning" that his "specific acts were unconstitutional." Taylor v. Riojas, 141 S. Ct. 52, 53, 208 L. Ed. 2d 164 (2020)(*per curiam*); *see also* McCoy v. Alamu, 141 S.Ct. 1364 (2021) (vacating the affirmance of  a finding of qualified immunity for officer who used OC to spray an inmate in his cell without warning or provocation after **another** inmate had thrown something at the officer).

Everyone should be aware of the dangers of saturating the air with respiratory agonists, as the DOC has recognized most notoriously in the recently settled Busbee v. Pennsylvania Department of Corrections (1:20-cv-02401-CCC-SES (M.D. Pa.),  in which the claim was that cans of OC were used against an asthmatic inmate who was then left handcuffed in the prison yard in obvious medical distress. The undisputable facts put Carter at the other end of the legal spectrum. There was a reason for Polito to use OC, the amount of OC used on Carter was minimal, Carter was promptly seen in the medical unit where he was treated, and there is no evidence of any injury beyond transitory pain. The bulk of caselaw would have told Polito that what he did was permissible; it certainly would not have given him fair warning that his use of a burst of OC on an unrestrained inmate out of his cell who had not complied with an order to be cuffed could subject him to liability.

### State Claims

Carter claims that Polito's actions constitute negligence and intentional infliction of emotional distress. There are no state law claims against Polito. Under Pennsylvania law, 1 Pa.C.S.§ 2310, "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." Pennsylvania waives immunity "as a bar to an action against Commonwealth parties," 42 Pa.C.S.§ 8522(a), for injuries caused by negligence in one of the ten ways listed in 42 Pa.C.S.§ 8522(b), and only those. 42 Pa.C.S.§ 8521(a). None of the exceptions is applicable here. Therefore, sovereign immunity is a "bar to an action against Commonwealth parties, for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of

action if the injury were caused by a person not having available the defense of sovereign immunity." 42 Pa.C.S.§ 8522(a). Polito is a Commonwealth party because he is an employee of the Pennsylvania Department of Corrections and he is allegedly liable to plaintiff because and only because of actions taken within the scope of his employment. See 42 Pa.C.S.§ 8501 (definitions).

Pursuant to 28 U.S.C.§ 636(b)(1), plaintiff can within fourteen days file written objections to this Report and Recommendation. Plaintiff is advised that in the absence of timely and specific objections, any appeal would be severely hampered or entirely defaulted. See EEOC v. City of Long Branch, 866 F.3d 93, 100 (3d Cir.2017) (describing standard of appellate review when no timely and specific objections are filed as limited to review for plain error).

DATE:  January 14, 2022 

Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel of record and by U.S. Mail to:

Solomon Carter KF-1334
S.C.I. Phoenix
1200 Mokychic Road
Collegeville, PA 19426

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SOLOMON CARTER,                    )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )    Civil Action No. 3:18-cv-232
                                   )    Judge Stephanie L. Haines
SECURITY OFFICER POLITO, *et al.*, )    Magistrate Judge Keith A. Pesto
                                   )
                Defendant.         )

## MEMORANDUM AND ORDER

This is a civil rights case brought under 42 U.S.C. § 1983 by Solomon Carter ("Plaintiff"),

a state prisoner currently incarcerated at SCI-Phoenix. Plaintiff alleges that Defendant Douglas

Polito, a corrections officer at SCI-Houtzdale where Plaintiff formerly was housed, "maliciously

and sadistically" sprayed him with oleoresin capsicum (OC) spray, contrary to a medical directive

on record at the prison, in violation of the Eighth Amendment and state law.

This matter was referred to Magistrate Judge Keith A. Pesto for proceedings in accordance

with the Federal Magistrates Act, 28 U.S.C. § 636, and Local Civil Rule 72.D.

## I.     Background

Plaintiff filed the operative amended complaint on July 15, 2019 [Doc. 21].[1]  Defendant

---

[1]  In addition to Defendant Polito, Plaintiff's original complaint [Doc. 4] named nine additional defendants (John Wetzel, Donna Varner, Keri Moore, Barry Smith, CO Kelly, "Intelligence Captain," Psychologist Walmer, F. Nunez, "Grievance Coordinator," and Ms. Reamney). Upon initial screening of the original complaint, Judge Pesto recommended dismissal without prejudice of the complaint against all defendants, except Polito, for failure to state a claim upon which relief can be granted [Doc. 3]. Plaintiff then filed an "amendment to complaint" [Doc. 5] indicating that "all other defendant[s] name[s] are release[d] unless the court re-enters them." Upon filing of his amended complaint [Doc. 21], Plaintiff captioned it "Solomon Carter v. John Wetzel, *et al.*, Defendant(s)," and renamed as parties the same ten defendants identified in the original complaint, including the nine who previously had been dismissed. It does not appear that any of the other nine defendants have ever been served with the amended complaint. In any event, the amended complaint does not contain any specific allegations that any of the other nine

1

Polito filed an answer on May 19, 2020 [Doc. 32], then filed a motion for summary judgment [Doc. 41] and accompanying documents [Docs. 42, 43, 44] on August 31, 2020. After granting numerous extensions to file a response, Judge Pesto submitted a Report and Recommendation on September 2, 2021 [Doc. 69], recommending that Defendant's motion for summary judgment be granted. Plaintiff filed an objection on September 29, 2020 [Doc. 71]. On September 30, 2020, this Court by text entry rejected the Report and Recommendation as moot and directed Judge Pesto to consider the issues raised in Plaintiff's objections [Doc. 72]. On October 12, 2021, Defendant Polito filed a response to Plaintiff's objections [Doc. 73], to which Plaintiff filed a reply on October 29, 2021 [Doc. 74].

On January 14, 2022, Judge Pesto submitted a Report and Recommendation again recommending that Defendant's motion for summary judgment be granted [Doc. 76]. Petitioner was advised that he had fourteen days from the date of service to file written objections to the Report and Recommendation. *See* 28 U.S.C. § 636 (b)(1)(B) and (C) and Local Civil Rule 72.D.2. On February 4, 2022, Plaintiff timely filed objections to the Report and Recommendation with various exhibits [Doc. 77]. On February 11, 2022, Defendant filed a response to Plaintiff's objections [Doc. 78].

## II.    Standard

When a party objects timely to a magistrate judge's report and recommendation, the district court must "make a de novo determination of those portions of the report or specified proposed

---

defendants had any personal involvement in the alleged wrongdoing, and therefore fails to correct the deficiencies identified in Judge Pesto's prior order dismissing those defendants. Accordingly, to the extent the amended complaint attempts to assert any claim against Defendants Wetzel, Varner, Moore, Smith, Kelly, Walmer, Nunez, Reamney or the unidentified Intelligence Captain and Grievance Coordinator, the amended complaint will be dismissed for failure to state a claim upon which relief can be granted, for the identical reasons set forth in Judge Pesto's prior order [Doc. 3]. Moreover, because Plaintiff was unable upon amendment to cure the defects previously identified, the dismissal of the amended complaint against those nine defendants will be <u>with</u> prejudice.

2

findings or recommendations to which objection is made." *EEOC v. City of Long Branch*, 866 F.3d 93, 100 (3d Cir. 2017) (quoting 28 U.S.C. § 636(b)(1)); *see also* Local Civil Rule 72.D.2. In doing so, the Court may accept, reject or modify, in whole or in part, the findings and recommendations made in the report. 28 U.S.C. § 636(b)(1). A district court is not required to make any separate findings or conclusions when reviewing a recommendation de novo under § 636(b). *See Hill v. Barnacle*, 655 F. App'x 142, 148 (3d Cir. 2016).

## III. Discussion

Upon de novo review of the report and the record, and, in particular, upon its independent review of the video recording of the incident (DIVAR Video of Incident 2016-A-933) submitted as Exhibit A to the Appendix to Defendant's motion for summary judgment [Doc. 44-1], this Court will accept the recommendation of Judge Pesto in this matter, and will grant summary judgment in favor of Defendant Polito on all claims.

### A. Report and Recommendation

The Cruel and Unusual Punishment Clause of the Eighth Amendment protects inmates against the application of excessive force by correctional officers. *See Whitley v. Albers*, 475 U.S. 312, 318-19 (1986). What is required to prove an Eighth Amendment violation "varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In an excessive force claim where a prison security measure is undertaken to resolve a disturbance that poses significant risks to the safety of inmates and prison staff, the pivotal inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.*, 503 U.S. at 7; *Whitley*, 475 U.S. at 320-21. Factors relevant to this inquiry include: the need for the application of force; the relationship between that need and the amount of force used; the threat reasonably perceived by the responsible

3

officials; and any efforts made to temper the severity of a forceful response. *Id.; see also Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000). The absence of serious injury is a relevant, but not dispositive, additional factor to be considered in the subjective analysis. *Hudson*, 503 U.S. at 7.

Here, Judge Pesto addressed the relevant factors in the report and reasonably concluded that no rational juror could find in favor of Plaintiff on his excessive force claim. The record evidence, including the video recording of the incident, fully supports Judge Pesto's conclusion. It is well-settled that where the events at issue have been captured on video, the court must consider that evidence in determining whether a genuine dispute of material fact remains for trial, and the court must view the facts in the light depicted by the video. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (relying on a video recording in assessing summary judgment evidence and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape").

In this case, the video recording, which lasts approximately 3 minutes and 16 seconds and captures the incident in its entirety, shows that the events at issue occurred in an open area with a number of other inmates around, with one officer sitting at a desk. Polito first can be seen walking down a staircase and he almost immediately is confronted by Plaintiff. There is no sound, but the two can be seen engaged in conversation. At one point Plaintiff appears to gesture at Polito. Plaintiff then walks to the desk where the other officer is sitting. Plaintiff subsequently kneels down on one knee with both arms resting on his knee in front of him. Polito starts to walk behind Plaintiff, apparently to cuff him. He then moves back in front of Plaintiff. As three other officers arrive on the scene, Polito sprays the OC in Plaintiff's face in a short two-three second burst from time stamp 6:53:29 to 6:53:32. Plaintiff then stands, goes back to one knee, then into a prone position on the floor, where he is cuffed and led away to the infirmary.

4

Judge Pesto's evaluation of the relevant factors in light of all of the evidence of record is sound, and the Court, viewing the facts in the light depicted by the video, agrees that no rational juror could view the video and conclude that Polito acted with malice for the purpose of inflicting harm. Rather, the video shows that the brief burst of spray, lasting at most 3 seconds, was necessary to resolve a disturbance in an area where officers were greatly outnumbered by inmates, and was no greater than necessary to restore discipline. Accordingly, summary judgment in favor of Defendant Polito is warranted.

**B.  Objections**

Plaintiff's lengthy objections to the Report and Recommendation are unavailing. The majority of Plaintiff's objections merely restate his version of events, which he argues creates a litany of disputed facts which preclude summary judgment. Plaintiff asserts, *inter alia*, that the incident was part of a "continuum of malice" on the part of Polito that began with his harassment of Plaintiff prior to the incident, and continued afterwards through Polito's filing of fraudulent reports related to the incident. He also makes additional assertions, such as that he exclaimed "I'm not a threat, please don't spray me," that he dropped to both knees, not one knee, and that he never disobeyed any orders because he was never told to put his hands behind his back. He further asserts that after he was taken to the infirmary, he had a "near death" experience from the effects of the OC spray.

While Plaintiff himself may dispute the facts of the incident, nothing in his response to the summary judgment motion or in his objections is sufficient to create any genuine issue of material fact. *See* Federal Rule of Civil Procedure 56(a). It is well-settled that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). Accordingly, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott*, 550 U.S. at 380.

In this case, Plaintiff's version of the events in question simply is not supported by the record. As just noted, at summary judgment, "where there are video recordings of the incident in question, [the court] need not adopt the non-movant's version of the facts if the recording 'blatantly contradict[s] the non-movant's version 'so that no reasonable jury could believe it.'" *McDowell v. Sheerer*, 374 Fed. Appx. 288, 291-92 (3d Cir. 2010) (citing *Scott*, 550 U.S. at 380). If a review of the video "refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate." *Smalls v. Sassaman*, 2019 WL 4194211, at *8 (M.D. Pa. Sept. 4, 2019) (citing *Tindell v. Beard*, 351 Fed. Appx. 591 (3d Cir. 2009)); *see also Carter v. Baumcratz*, No. 1:18-CV-00096, 2021 WL 4443767, at *4 (W.D. Pa. Sept. 28, 2021).

As already discussed, Plaintiff's version of the incident in question is belied by the video recording. It is clear from the video recording that Plaintiff did not kneel on both knees, that he never put his hands behind his back to be cuffed, and that he was sprayed in a short 2-3 second burst for the purpose of restoring compliance. Although there is no audio, the video itself fully corroborates the findings of the investigative report [Doc. 44-1, Exhibit B]. That report found that Plaintiff initiated the encounter by approaching Polito. It found that Plaintiff began arguing with Polito and that he approached him again shouting demands. It found that Polito instructed Polito to put his hands behind his back in order to be handcuffed, and that Plaintiff refused. Finally, it found that Plaintiff was sprayed, cuffed and escorted from the area.

The video fully aligns with the report. Plaintiff can be seen approaching Polito, he can be seen arguing with Polito, and at one point gesturing towards him. Polito can be observed using his radio for assistance. After Plaintiff drops to one knee, the video depicts Polito walking behind him, presumably in order to cuff him, then moving back in front of Plaintiff as Plaintiff's hands remain resting on his knee rather than behind his back. Plaintiff's alternative version of what transpired is utterly contradicted by the video recording, and the Court must view the facts in the light depicted by the video. *See Scott*, 550 U.S. at 380-81.

Because the majority of Plaintiff's objections either are unsupported by the record or fail to raise any genuine issue of material fact, they will be overruled. Several of Plaintiff's objections merit additional discussion, however. First are Plaintiff's allegations that the video recording submitted as evidence has been "tampered with," and that there was a second video recording of the incident from a handheld camera that has been concealed. Plaintiff has provided nothing supporting either of these assertions.

Initially, there is no evidence that the video recording that is before the Court was altered, despite Plaintiff's bald assertion that it was either photo-shopped or that portions of it have been omitted. However, the Court has viewed the video multiple times and there is nothing on the recording that would indicate it has been tampered with in any way. The recording is time-stamped with the date, hour, minute and second. The video runs continuously for a period of three minutes and sixteen seconds without any breaks. There is nothing unusual about the recording that suggests it is not genuine, and the description of the video in the investigative report is wholly consistent with what the Court observed upon its own viewing of it.

Likewise, Plaintiff has offered nothing but his self-serving assertion, along with a blurry photograph [Doc. 77-4] purportedly showing an officer with a camera, that a second video

7

recording from a handheld camera exists. Again, this Court has viewed the DIVAR recording on multiple occasions and there is no indication on that recording that any of the officers on the scene are recording the incident with a handheld camera. The officer sitting behind the desk does not have a camera, nor do any of the three officers who arrived on the scene for the last approximately thirty seconds of the incident. Although the last of these three officers appears to be holding something in his hand, it is not clear from the video recording what it is. In any event, whatever he is carrying is never pointed in the direction of Polito or the Plaintiff, and he only appears on the video for a few seconds, behind the other officers, before Plaintiff is sprayed.

Finally, Plaintiff's objections impugning the integrity of Judge Pesto are wholly unsubstantiated and are not well-taken. Plaintiff's disagreement with statements made in the report or with Judge Pesto's recommendation is not in any way evidence of bias or, far worse, Plaintiff's scurrilous accusations of bribery or an inappropriate connection with the Defendant. Judge Pesto neutrally applied the law to the facts of this case, and reasonably, and in this Court's view, correctly, concluded that Defendant is entitled to judgment as a matter of law.

## IV. Conclusion

As Judge Pesto reasonably found, no rational trier of fact viewing the video of the incident in question could conclude that Polito used excessive force on Plaintiff, and the video evidence wholly contradicts Plaintiff's accusations that Polito acted maliciously or sadistically. Plaintiff's objections that the video has been tampered with, or that another video of the incident exists and has been concealed, are not supported by any objective evidence, and his other objections are unavailing. Because no rational juror could find in favor of Plaintiff on his excessive force claim, or on any of his state law claims for the reasons set forth in the Report and Recommendation, Defendant's motion for summary judgment will be granted.

8

Accordingly, the following order is entered:

**ORDER OF COURT**

AND NOW, this 16th day of March, 2022, for the reasons set forth herein, IT IS ORDERED that, to the extent Plaintiff has named defendants other than Defendant Polito as parties in the amended complaint [Doc. 21], the amended complaint hereby is **dismissed with prejudice** as to any and all such named defendants for failure to state a claim upon which relief can be granted; and,

IT FURTHER IS ORDERED that Plaintiff's objections [Doc. 77] to the Magistrate Judge's Report and Recommendation [Doc. 76], hereby are **overruled**; and,

IT FURTHER IS ORDERED, pursuant to Federal Rule of Civil Procedure 56(a), and for the reasons set forth in the Magistrate Judge's Report and Recommendation [Doc. 76], which hereby is adopted as the opinion of the Court as supplemented herein, that Defendant Security Officer Douglas Polito's motion for summary judgment [Doc. 41] hereby is **granted**. A judgment order in favor of Defendant Polito will be entered separately in accordance with Federal Rule of Civil Procedure 58(a).

Stephanie L. Haines
United States District Judge

In The United States District Court For The
Western District Of Pennsylvania

Solomon Carter
        Plaintiff
    V.

Douglas Polito et al.
        Defendant (s)

: Case No. 3: 18-cv-232-KAP
:
: Hon. Stephanie L. Haines
:
: Jury Trial Demand

## Notice Of Appeal

And Now Comes, PRO-SE Plaintiff Solomon Carter on this
28th Day of March, 2022, who Hereby gives Notice of
Appeal to the Hon. Court. This Court is urged to Respond proceedurally to the Entry of the Instant Notice:

1. Plaintiff moves to Appeal Order of Summary
Judgment in the above Captioned Case, which was issued
march 16th, 2022.

Respectfully Submitted /s/ [signature]

Solomon Carter #KF-1334
S.C.I. Phoenix
1200 Mokychic Road
Collegeville, PA. 19426

Date: 3/28/22

**FILED**

APR 0 1 2022

CLERK U.S. DISTRICT COURT
WEST DIST OF PENNSYLVANIA

JA 021

## Proof Of Service & Verification

I, Solomon Carter, hereby certify that on this 28th day of march 2022 the enclosed Notice Of Appeal is True and Correct to the best of my knowledge and by law subject to penalties of perjury under ( 28 U.S.C. § 1746)

This Notice of Appeal shall be served upon the following parties by U.S. Mail.

U.S. District Court
Western District of PA.

Office Of Atty. Gen.     Hon Stephanie L. Haines
1521 Waterfront Place    319 Washington St.
Pittsburgh, PA. 15222    Johnstown, PA. 15901

Respectfully /s/

Solomon Carter # KF-1334
S.C.I. Phoenix
1200 Mokychic Road
Collegeville, PA. 19426

Date: 3/28/22